Date signed July 31, 2014



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | * | Case No.   14-20847-TJC |
| Jane L. Fairweather | * | Chapter    11 |
| Debtor | * | |
| *    *    *    *    *    *    *    * | * | |
| Jane L. Fairweather | * | |
| Plaintiff | * | |
| vs. | * | Adversary No.  14-00435 |
| Monument Bank, *et al.* | * | |
| Defendants | * | |
| *    *    *    *    *    *    *    *    *    *    *    *    * | | |

### <u>MEMORANDUM OF DECISION</u>

The debtor, Jane L. Fairweather (the "Debtor"), brought a six count complaint seeking to recover, among other things, commissions from real estate sales that were garnished by Monument Bank (the "Bank") from the real estate agency with which the Debtor is affiliated. Two issues are addressed here: (1) whether the Bank received a transfer, as that term is used in 11 U.S.C. §547(b), when its garnishment lien attached to commissions that became due to the Debtor during the 90-day preference period before the petition was filed; and (2) do the limitations on garnishments contained in Subchapter II of the Consumer Credit Protection Act apply to nonconsumer, as well as consumer, debts.  For the reasons that follow, the court

concludes that the Bank received a transfer during the 90-day preference period and that the limitations on garnishments contained in the Consumer Credit Protection Act apply to nonconsumer debts.

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§1334 and 157(a) and Local Rule 402 of the United States District Court for the District of Maryland. This memorandum of decision resolves a core matter under 28 U.S.C. §157(b)(2)(F).

**Procedural Posture**

The Debtor filed her complaint and a motion for a temporary restraining order and preliminary injunction on July 15, 2014. The Debtor asserted that the Bank had been garnishing 100% of her commissions for four months and she needed immediate access to funds to pay necessary business and personal expenses. At a hearing on the motion for temporary restraining order on July 17, 2014, the parties reached an interim agreement for the disbursement of some funds to the Debtor, thus alleviating the need for an emergency judicial resolution. The Debtor and the Bank then filed briefs on the issues addressed here and the court held a further hearing on July 30, 2014.

The parties agree that, with respect to the Debtor's preference claim, all elements of 11 U.S.C. §547 are met except for the present dispute over whether a transfer occurred during the preference period. Thus, with the agreement of the parties, the court will treat the briefs submitted by the parties on the §547 issue as cross-motions for summary judgment on Count I of the complaint.

With respect to the Debtor's claims under the Consumer Credit Protection Act, the parties have briefed the legal issue described above – whether the garnishment limitations in Subchapter II of the Consumer Credit Protection Act apply to nonconsumer debts – and it is only that issue

that is resolved here.  The resolution of the Debtor's claims under the Consumer Credit Protection Act must await further proceedings.

## Material Facts Not In Dispute

The Debtor is a licensed real estate associate affiliated with NRT Mid-Atlantic, LLC dba Coldwell Banker Residential Brokerage ("CBRB"), and is paid earnings in the form of commissions on closed real estate transactions.

On June 26, 2006, the Debtor and her husband, David Fairweather executed a guaranty agreement for a promissory note to the Bank in the amount of $1,100,000.00 made by their business entity, Fairweather Investments, LLC.  The guaranty agreement contained a confessed judgment provision.

On June 29, 2007, the Fairweathers executed a second guaranty agreement for another promissory note to the Bank in the amount of $1,800,000.00 made by Fairweather Investments, LLC.  The guaranty agreement also contained a confessed judgment provision.

Fairweather Investments, LLC failed to make payments under the notes and the Bank obtained a confessed judgment against the Fairweathers on February 8, 2012, in the principal amount of $1,080,479.30 in the Circuit Court for Montgomery County, Maryland.[1]

On March 12, 2014, the Bank served a writ of garnishment of property other than wages and a writ of garnishment of wages on CBRB.  On or about June 27, 2014, CBRB filed an amended answer to the garnishment in which it acknowledged holding $522,630.49, in commissions owed to the Debtor and $48,880, in commissions otherwise payable to the Debtor or her team.[2]

---

[1]  The Bank asserts it also obtained a confessed judgment against the Fairweathers on January 30, 2012, in the principal amount of $1,793,391.51.  The Debtor has not admitted this fact, and it is not material to the issues raised herein.

[2]  The parties do not dispute that some of the garnished funds were payable to individual members of the Debtor's "team" and have consensually resolved those amounts.

The Debtor commenced this case by filing a voluntary chapter 11 bankruptcy petition on July 8, 2014.  She filed the subject adversary proceeding and motion for temporary restraining order and preliminary injunction on July 15, 2014.

### Conclusions of Law

*Transfer under 11 U.S.C. §547.*

Section 547(b)[3] provides that the trustee "may avoid any transfer of an interest of the debtor in property" if certain elements are met.  As stated above, the parties agree that all of the elements of an avoidable preference are met, except for whether the Bank received a "transfer" within the 90-day preference period.  The court concludes that the Bank received a transfer when commissions earned by the Debtor and payable by CBRB during the preference period became subject to the Bank's garnishment.

The material facts are not in dispute.  At the time the Bank served the writ of garnishment on CBRB on March 12, 2014, CBRB owed commissions that were payable to the Debtor and therefore were subject to the garnishment.  Additional commissions became payable to the Debtor during the period between March 12, 2014, and the 91st day before the bankruptcy filing.  The Debtor does not seek to avoid the Bank's garnishment on the commissions that were payable to the Debtor on the date the garnishments were served or that became payable between March 12, 2014, and the 91st day before the bankruptcy filing.  The Debtor earned and was owed commissions during the 90-day period before the petition date (the "Preference Period Commissions").  In CBRB's amended answer to the garnishment, it includes Preference Period Commissions, and it is those commissions that are the subject of this dispute.  The Debtor filed the bankruptcy petition before the Circuit Court issued a judgment order on the garnishment action.

---

[3]  All statutory references in this section are to Title 11 of the United States Code, 11 U.S.C. §§101, et. seq.

The Bank contends that its garnishment lien was perfected when it served the writ of garnishments on March 12, 2014, outside of the preference period, and all Preference Period Commissions came into the estate subject to the garnishment lien. The Bank argues, therefore, that the transfer under §547 of the lien on the Preference Period Commissions occurred when it served the garnishments and not when they came into existence. This court disagrees.

Under Maryland law, a garnishment extends to the property held or indebtedness owed by the garnishee at the time the garnishment is served, but also to all such property or indebtedness as of the time the garnishment judgment is entered. Md. Rule 2-645(j). "An attachment by way of garnishment issued after judgment is a mode of execution and its function is approximately the same as that of a writ of fieri facias." *Northwestern Nat. Ins. Co. v. William G. Weatherall, Inc.*, 298 A.2d 1, 5 (Md. 1972). A garnishment attachment "is used to create a judgment lien upon the debtor's interest in property held by a third party . . . ." *In re Smith*, 382 B.R. 279, 284 (Bankr. D. Md. 2006). The lien is created when the writ of garnishment is issued by the court in which the judgment is entered or recorded and the writ is served on the party holding the property or owing the obligation. *Id.*; *See also* Md. Rule 2-645(k) ("Upon entry of a judgment against the garnishee . . ., the writ of the garnishment and the lien created by the writ shall terminate . . . ."). The attachment "creates an inchoate lien that is binding on goods, monies and credits of the judgment debtor which the garnishee then has in his possession, as well as all those which come into his hands down to the trial and judgment in the garnishment action. This inchoate lien becomes consummate with the entry of a judgment of condemnation absolute." *Northwestern Nat. Ins. Co.*, 298 A.2d at 5.

With respect to the Preference Period Commissions, the lien attached to those commissions as they were earned by the Debtor and when CBRB became obligated to pay them

to the Debtor.  Section 547(e)(3) provides that, for purposes of §547, "a transfer is not made until the debtor has acquired rights in the property transferred."  §547(e)(3).  Thus, the attachment of the garnishment lien to the Preference Period Commissions constituted a transfer on the date they were earned by the Debtor and payable by CBRB during the preference period.  *See Cox v. General Electric Corp.*, 10 B.R. 268, 271 (Bankr. D. Md. 1981).  As succinctly described in *In re Wilkerson*, 196 B.R. 311 (Bankr. E.D. Va. 1996):

> There can be no question that an execution lien is a "transfer" for the purposes of §547, Bankruptcy Code.
>
> ******
>
> However, an execution lien (like any other lien) cannot effect a transfer until the debtor has acquired rights in the property transferred. In the case of wages, this means that, although the employer may have been served with a garnishment summons, the execution lien does not attach—and thus a transfer does not occur—until the wages are actually earned. Thus, if wages withheld under garnishment process are *earned* within 90 days of the filing of the debtor's petition, the fixing of the execution lien on them may be avoided as a preference.

196 B.R. at 319 (citations and quotations omitted).  Numerous cases support this principle.  For example, in *In re Krumpe,*  the court stated

> A writ of garnishment may well be a duly perfected lien on wages yet to be earned such that a creditor on a simple contract cannot acquire a judicial lien that is superior to the rights of the judgment creditor. *Cf.* 11 U.S.C. § 547(e)(1)(B) (Supp. III 1979). Nonetheless, the avoidance powers under § 547(b) extend to the avoidance of transfers rather than perfection of liens. Inasmuch as § 547(e)(3) establishes that a transfer does not occur until the debtor has rights in the collateral, the transfer of wages garnished pursuant to a writ of garnishment cannot occur until the judgment debtor has earned the wages garnished.

60 B.R. 575, 578 (Bankr. D. Md. 1986).  *Krumpe* cites several case that to the same effect.  *Id*.

At the hearing, the Bank attempted to distinguish its garnishment of the commissions from a garnishment of wages.  It argued that its garnishments created a lien on the contract rights between CBRB and the Debtor, and therefore it held a "continuing lien" on all commissions that

were generated under the contract.  While, as stated above, the garnishment lien attaches to

commissions as they become earned by and payable to the Debtor, the Bank does not allege that

CBRB has an obligation to pay the Debtor any amounts at all unless and until the Debtor earns

them in the form of commissions.  The "contract right" that was garnished was CBRB's

obligation to pay the Debtor commissions as she earns them.  Section 547(e)(3) dictates that the

transfer cannot occur until the Debtor "has acquired rights in the property transferred,"  and the

Debtor has no right to the commissions until they are earned.  Thus, whether the commissions

are considered to be wages or commissions payable pursuant to a contract, §547(e)(3) establishes

that they are transfers when they are earned.[4]

Moreover, assets often come into existence during the preference period that are subject

to a lien established prior to the preference period.  This routinely occurs when a lender holds a

pre-preference period security interest in after-acquired receivables or inventory and, due to the

effect of §547(e)(3), it is the very reason for §547(c)(5):

> Section 547(c)(5) is indispensable to secured parties with floating liens
> because of the timing of transfer rules in section 547(e).  Section 547(e)(3)
> provides that, in determining whether a particular transfer is preferential,
> "a transfer is not made until the debtor has acquired rights in the property
> transferred."   Accordingly, the debtor's granting of security interests in
> after-acquired inventory and receivables occurs on the date the debtor
> acquires rights in the collateral, not the date of the original security
> interest was perfected.   Thus, virtually all security interests in after-
> acquired property will be considered transfers on account of antecedent
> debt, and will be avoidable by the trustee unless protected by section
> 547(c)(5) or one of the other preference exceptions.

---

[4] The Bank cites to *In re Smith*, 382 B.R. 279, to support its position.  *Smith* stands for the proposition that a
garnishment lien constitutes a transfer under §547 when served, a point that is not disputed.  *Smith* did not involve a
situation where a garnishment was served on a bank before the preference period, and the account balance increased
through deposits made during the preference period.  Therefore *Smith* does not address the dispute here or the
application of §547(e)(3).

5 Collier ¶547.04[5], p. 547-68 (16th ed. 2013). While §547(c)(5) does not apply to the garnishments, the need for the protections it gives to lenders undermines the Bank's "continuing lien" argument.

The Bank also cites to *Freedom Group, Inc. v. Lapham-Hickey Steel Corp. (Freedom Group)*, 50 F.3d 408 (7th Cir. 1995). There, a writ of garnishment was served on bank accounts outside the 90-day preference period. The garnishing court issued the judgment order on the garnishment during the preference period. The court rejected the many cases that hold that a transfer occurs under §547 when the garnishment is served. It held that a transfer does not occur for purposes of §547 "until a final order of garnishment or attachment is issued" in the garnishment action. *Freedom Group*, 50 F.3d at 411. The court recognized that its decision was against the great weight of authority, including that of the Fourth Circuit in *Walutes v. Baltimore Rigging, Co.*, 390 F.2d 350 (4th Cir. 1968). *Id.* at 412.

*Freedom Group* provides no support for the Bank's position one way or the other.[5] *Freedom Group* expressly rejects decisions such as *Smith* that hold that a transfer occurs for purposes of §547 when a garnishment is served, *id.* at 412, but the Bank does not share *Freedom Group*'s view on that issue. In any event, the most direct response to the holding of *Freedom Group* is that it is contrary to the law of the Fourth Circuit and, for that matter, cases within the Fourth Circuit. *Walutes*, 390 F.2d 350; *In re Lamm*, 47 B.R. 364, 369 (E.D.Va. 1984).[6]

---

[5] The Bank made it clear at the hearing that it does not contend that, because the state court has not entered a judgment on the attachment action, no transfer has taken place under §547 under the rationale of *Freedom Group*.

[6] In both *Walutes* and *Lamm*, the writ was served and all funds withheld before the preference period. Thus, the courts did not address the effect of §547(e)(3) on funds that were withheld during the preference period on a garnishment served before the period commenced. But both opinions are contrary to *Freedom Group*'s holding that a transfer occurs under §547 when the state court issues the judgment in the garnishment action and not when the writ of garnishment is served.

For the foregoing reasons, the court concludes that the garnishment lien on the Preference Period Commissions is an avoidable preference and will grant summary judgment to the Debtor. *See* Count I of the complaint.

*Garnishment Limitations under the CCPA.*

Subchapter II of the Consumer Credit Protection Act (the "CCPA"), 15 U.S.C. §§1601 et seq. (2014),[7] contains limitations on amounts of earnings that can be subject to a garnishment. The Bank contends that the garnishment limitations of Subchapter II apply only to debts that arise out of a transaction that was primarily for a personal, family, or household purposes, and the Debtor's guaranty obligations do not meet this standard. The Debtor contends that the limitations apply to "any debt" except for the specific debts excepted by the statute. For the reasons that follow, the court concludes that the garnishment limitations of Subchapter II of the CCPA apply to both consumer and nonconsumer debts.

When interpreting a statute, courts first consider the plain meaning of the statutory language. *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010). Where "the statute's language is plain, the sole function of the courts is to enforce it according to its terms," except in rare cases when "the literal application . . . will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters., Inc*., 489 U.S. 822, 828 (1984); *Ayers v. United States Dep't of Veterans Affairs*, 473 F.3d 104, 108 (4th Cir. 2006). In examining a statute's meaning, courts read the statute as a whole and do not consider statutory phrases in isolation. *United States v. Mitchell*, 518 F.3d 230, 233–34 (4th Cir. 2008) (citing *United States v. Morton*, 467 U.S. 822, 828 (1984)). Courts will also look to the policy of the law:

---

[7] All statutory references from this point forward will be to Title 15 of the United States Code.

> the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature.

*Kokoszka v. Belford*, 417 U.S. 642, 650 (1974), 94 S.Ct. 2431.  Where the meaning is not plain, courts often apply a holistic approach to statutory interpretation.  *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988); *Yi v. Fed. Bureau of Prisons*, 412 F.3d 526, 530 (4th Cir. 2005) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)) (stating that analysis of particular statutory language is also informed by "the specific context in which that language is used, and the broader context of the statute as a whole.").

The CCPA consists of six Subchapters.  Each Subchapter has its own set of definitions and rules of construction that are applicable to that Subchapter.  *See* §§1602, 1672, 1679a, 1681a, 1691a, 1692a, 1693a.  For example, the Bank makes much of the fact that the definition of "consumer" in §1602(i), Subchapter I – Consumer Credit Cost Disclosure, states:

> The adjective "consumer", used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes.

§1602(i).  However, as in all the Subchapters, the "definitions and rules of construction set forth in [Subchapter I] are applicable for the purposes of this subchapter."  §1602(a).  Further, the word "consumer" is not used anywhere in Subchapter II-Restrictions on Garnishment, which is at issue here.  The word "consumer" is, however, defined in other subchapters as: (i) "an individual" in Subchapters II-A. Credit Repair Organizations and Subchapter III-Credit Reporting Agencies; (ii) "a natural person" in Subchapter VI-Electronic Fund Transfers; and (iii) "any natural person obligated or allegedly obligated to pay any debt" in Subchapter V-Debt

Collection Practices. *See* §§1679a(1),1681a(c), 1693a(6), and 1692a(3). Thus, it certainly cannot be said that a definition of one Subchapter applies to other Subchapters without further consideration.

The "Restrictions on Garnishment" that are pertinent here are contained in Subchapter II, enacted in 1968. *See* Consumer Credit Protection Act, Pub. L. No. 90-321, §301, 82 Stat. 163 (1968). The restrictions are set forth in §1673, which provides:

> (a) Maximum allowable garnishment
>
> Except as provided in subsection (b) of this section and in section 1675 of this title, the maximum part of the aggregate disposable earnings of an individual for any workweek which is subjected to garnishment may not exceed
>
> (1) 25 per centum of his disposable earnings for that week, or
> (2) the amount by which his disposable earnings for that week exceed thirty times the Federal minimum hourly wage prescribed by section 206(a)(1) of Title 29 in effect at the time the earnings are payable, whichever is less. In the case of earnings for any pay period other than a week, the Secretary of Labor shall by regulation prescribe a multiple of the Federal minimum hourly wage equivalent in effect to that set forth in paragraph (2).

§1673(a). Subchapter II provides that "[n]o court of the United States or of any State . . . may make, execute, or enforce any order or process in violation of this section." §1673(c). The term "garnishment" means "any legal or equitable procedure through which the earnings of any individual are required to be withheld for payment of any debt." §1672(c). Thus, under the express terms of Subchapter II, the limitations on garnishments apply to the garnishment of "any debt," and no court may enforce a garnishment in excess of the limitations in §1673(a), with certain exceptions contained in §1673(b) that are not relevant to this discussion.

The Bank, however, argues that the limitations on garnishment apply only to consumer debts. It relies on the definition of "debt" in Subchapter V. But Subchapter V is a stand-alone

statute commonly referred to as the Fair Debt Collection Practices Act ("FDCPA").  *See e.g.*,

*Carroll v. Wolpoff & Abramson*, 961 F.2d 459, 462 (4th Cir. 1992) ("In 1977, Congress enacted

the Fair Debt Collections Practices Act to eliminate abusive debt collection practices.").

The FDCPA defines "debt" as

> any obligation or alleged obligation of a consumer to pay money arising
> out of a transaction in which the money, property, insurance, or services
> which are the subject of the transaction are primarily for personal, family,
> or household purposes, whether or not such obligation has been reduced to
> judgment.

§1692a(5).  The Bank urges the court to apply the FDCPA definition of "debt" to Subchapter II

and conclude that because the garnishment was not for a debt that arose out of a transaction that

was primarily for personal, family, or household purposes, the garnishment limitations of

§1673(a) do not apply.  For several reasons, this court disagrees with the Bank's interpretation.

The definition of "debt" in §1692a(5) is expressly stated to be "used in this [Subchapter

V]."  Thus, by the terms of the FDCPA, its definition of debt does not apply to Subchapter II.

The Bank argues that the limitation on the definition of "debt" in the FDCPA does not mean that

it cannot be used for Subchapter II.  However, as stated above, each Subchapter contains its own

definitions, and each set of definitions contain the same limitations that the definitions are "as

used in this [Subchapter]."  Thus, in the court's view, the failure to include a definition in

Subchapter II that is included in the FDCPA is telling.

Moreover, the different objectives and protections targeted by Subchapter II, on the one

hand, and the FDCPA, on the other, support the conclusion that Subchapter II applies to both

consumer and nonconsumer debts while the FDCPA applies only to consumer debts.

Subchapter II is intended to protect individuals from excess garnishments.  Its focus is

not on the creditor, but on the borrower.  The statute expressly recognizes the "[d]isadvantages

of garnishment," §1671(a), and the Congressional findings and declaration of purpose of Subchapter II support the conclusion that the garnishment limitations apply to both consumer and nonconsumer debts.  One finding and declaration of purpose of Subchapter II is that

> The unrestricted garnishment of compensation due for personal services encourages the making of predatory extensions of credit. Such extensions of credit divert money into excessive credit payments and thereby hinder the production and flow of goods in interstate commerce.

§1671(a)(1).  As the Debtor points out, the "unrestricted garnishment of compensation due for personal services encourages the making of predatory extensions of credit" because debtors who lack access to their wages will resort to payday, car title, high interest rate, and other emergency predatory loans.

An additional Congressional finding and declaration of purpose of Subchapter II is that

> The application of garnishment as a creditors' remedy frequently results in loss of employment by the debtor, and the resulting disruption of employment, production, and consumption constitutes a substantial burden on interstate commerce.

§1671(a)(2).  An important protection provided by Subchapter II in furtherance of this purpose is the restriction in §1674 on discharge from employment by reason of garnishment.[8]  Given this stated purpose and protection, there is no rational reason to exclude from the limitations of §1673 garnishments for debts that are not incurred for personal, family, or household purposes.  The loss of employment by an individual is no less harsh if it resulted from the garnishment of a nonconsumer debt rather than a consumer debt.

Finally, the third finding and declaration of purpose of Subchapter II, as stated by Congress, is

---

[8]  Section 1674 provides that "No employer may discharge any employee by reason of the fact that his earnings have been subjected to garnishment for any one indebtedness."  §1674(a).

> The great disparities among the laws of the several States relating to garnishment have, in effect, destroyed the uniformity of the bankruptcy laws and frustrated the purposes thereof in many areas of the country.

§1671(a)(3).  Here again, the goal of achieving a uniform law governing garnishments of individual earning is furthered by applying §1673 to a broad range of debts, both consumer and nonconsumer.

The FDCPA, on the other hand, is focused expressly on preventing abusive consumer debt collection practices.  *Wolpoff*, 961 F.2d at 460 ("Congress enacted the Fair Debt Collections Practices Act to eliminate abusive debt collection practices.").  Its provisions apply to those who make and collect debts, not those who repay them.  Each operative provision of the FDCPA prohibits a debt collector from taking certain action or requires it to take certain action.  §§1692(b)-(i).  Among the Congressional findings leading to the enactment of the FDCPA are that there "is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors."  §1692(a).  Congress also stated

> It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.

§1692(e).  In light of these findings and statements of purpose, the reason for limiting the FDCPA to consumer debts is obvious, because the collection practices on those debts is precisely the target of the statute.  Thus, it is entirely consistent with the different purposes behind Subchapter II and the FDCPA that they would apply to different categories of debts.

Finally, the court in *In re Robinson*, 240 B.R. 70 (Bankr. N.D. Ala. 1999) also concluded that the garnishment limitations in Subchapter II applied to nonconsumer debts.  In determining the amount of wages that could be garnished from the debtor under §1673(a), the court stated that "Unlike the [state garnishment limitations], the Federal Garnishment Limitations is not

similarly restricted.  It applies to individuals and to obligations arising from more than consumer credit transactions."  *In re Robinson*, 240 B.R. at 83.  This court shares that view.

**Conclusion**

For the foregoing reasons, the court concludes that the Bank's garnishment lien on the Preference Period Commissions is an avoidable preference and will grant summary judgment to the Debtor on Count I of the complaint.  The court also concludes that the garnishment limitations in Subchapter II of the CCPA apply to nonconsumer debts.  The resolution of any remaining issues concerning the application of the garnishment restrictions of the CCPA must await further factual development.

cc:     Plaintiff
        Plaintiff's Counsel
        Defendants
        Defendants' Counsel
        U.S. Trustee

**END OF MEMORANDUM**